FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2019 AUG 16 PM 4:41
JEFFREY P. COLWELL
CLERK
BY_____DEP. CLK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

'19 - CV - 02354

BRIAN HALIK,

    Plaintiff,

v.

STEVEN D. BROWN, Sergeant, El Paso County Sheriff's Office, individually and in his official capacity;

JOSEPH CAREY, Deputy, El Paso County Sheriff's Office, individually and in his official capacity;

JOHN P. DAVID, Commander, El Paso County Sheriff's Office, individually and in his official capacity;

BILL ELDER, Sheriff, El Paso County Sheriff's Office, in his official capacity;

EL PASO COUNTY;

    Defendants.

---

### COMPLAINT AND JURY DEMAND

---

    Plaintiff, Brian Halik, who is currently proceeding *pro se*, respectfully alleges for his Complaint as follows:

### INTRODUCTION

1. Plaintiff brings this civil rights action against Defendants for monetary damages, declaratory relief, injunctive relief, and relief in the nature of mandamus, brought pursuant to 42 U.S.C. § 1983.

2. On August 19, 2017, El Paso County Sheriff's Office ("EPSO") Deputy David DeHaan initiated a traffic stop on Plaintiff's motorcycle for proceeding past a stop

        sign without stopping. Plaintiff did not pull over and Deputy DeHaan pursued Plaintiff. EPSO Sergeant Steven Brown and other Deputies violated numerous laws and policies in pursuing the motorcycle, then used excessive force against Plaintiff by ramming into him head-on. Numerous EPSO Deputies, including Sergeant Brown, violated Plaintiff's Constitutional rights during and after the pursuit, Plaintiff's incarceration, and subsequent cover-up and treatment of Plaintiff.

3. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391. All the events alleged herein occurred in the State of Colorado, and all the parties were residents of and/or domiciled in the State of Colorado at the time of the events giving rise to this litigation.

## PARTIES

5. Plaintiff is a citizen of the United States and resides within the confines of this court. Plaintiff is currently proceeding *pro se.*

6. Defendant Steven D. Brown, also known as Steven Douglas Brown, is a Sergeant with the El Paso County Sheriff's Office. At all times relevant to this litigation, he was acting under color of state law.

7. Defendant Joseph Carey is a Deputy with the El Paso County Sheriff's Office. At all times relevant to this litigation, he was acting under color of state law.

8. Defendant John P. David is a Commander with the El Paso County Sheriff's Office. Commander John P. David was a Lieutenant and directly supervised Defendant Brown at the time of this incident. At all times relevant to this litigation, he was acting under color of state law.

9. Defendant El Paso County is a governmental entity chartered under the laws of the State of Colorado.

## FACTUAL ALLEGATIONS

10. On August 19, 2017 at approximately 11:16 PM, El Paso County Sheriff's Office ("EPSO") Deputy David DeHaan initiated a traffic stop on Plaintiff for running a stop sign. Plaintiff was riding his legally owned and registered motorcycle in the

City of Colorado Springs, Colorado. Deputy DeHaan was driving a marked EPSO Chevrolet Impala. Plaintiff did not yield to Deputy DeHaan's lights and siren.

11. Deputy DeHaan notified dispatch over his police radio that Plaintiff had run a stop sign and was not stopping for Deputy DeHaan's emergency lights and siren. Deputy DeHaan pursued Plaintiff through pedestrian traffic and vehicle traffic from Geiger Blvd to Babcock Rd to Platte Ave.

12. Defendant Brown overheard Deputy DeHaan on his police radio and drove to the anticipated direction of the pursuit. Defendant Brown was driving a marked EPSO Chevrolet Tahoe.

13. Defendant Brown and another Deputy in a marked Chevrolet Impala set up a roadblock across the westbound lanes of traffic on Platte Ave at its intersection with Wooten Rd. Defendant Brown knowingly used unsuspecting, occupied civilian vehicles as unwilling participants in the roadblock.

14. As Plaintiff approached the roadblock, Defendant Brown drove his EPSO Chevrolet Tahoe eastbound against oncoming traffic on Platte Ave. With Plaintiff still traveling westbound, Defendant Brown approached Plaintiff head on. Defendant Brown stopped just short of Plaintiff, narrowly avoiding a head-on collision.

15. Plaintiff maneuvered his motorcycle around Defendant Brown's vehicle and proceeded south on Wooten Rd, then west on Platte Ave Service Rd, also known as Platte Frontage Rd. Deputy DeHaan continued pursuing Plaintiff, along with another EPSO Deputy. Defendant Brown did not follow Plaintiff. He instead drove west on Platte Ave and crossed southbound over the median in order to intercept Plaintiff in another head-on encounter.

16. With Plaintiff traveling west on Platte Ave Service Rd, Defendant Brown began traveling east on Platte Ave Service Rd. Plaintiff was driving on the right side of the road (from Plaintiff's perspective), which was the north side of the road. Defendant Brown was driving on the left side of the road (from Defendant Brown's perspective), which was also the north side of the road. Defendant Brown was again driving against oncoming lanes of traffic.

17. As Defendant Brown was aiming to collide with Plaintiff in a head-on collision, Plaintiff attempted to avoid Defendant Brown by turning to the left, the south side of the road. Defendant Brown then turned his Chevrolet Tahoe to his right, also the south side of the road, in order to strike Plaintiff.

18. Defendant Brown then rammed into Plaintiff at a high rate of speed in a nearly head-on collision.

19. Video of this entire incident was recorded on Plaintiff's helmet-mounted GoPro camera.

20. Defendant Brown indicated in his report that Plaintiff was traveling in the "middle of the road" on Platte Ave Service Rd, despite knowing that to be false. Plaintiff's GoPro video clearly shows that Plaintiff was in fact traveling on the far-right portion of the road.

21. Defendant Brown indicated in his report that he was traveling at "approximately 20 mph" while he was driving to intercept the pursuit head-on, when in fact, he knew that he was traveling significantly faster than that.

22. The Deputies involved in the pursuit sought to intentionally downplay the severity of Plaintiff's injuries by understating the speed of the collision, accusing Plaintiff of faking his injuries, and stating that Plaintiff was standing upright on his motorcycle before laying it down. However, the aforementioned GoPro video clearly depicts a violent collision with Defendant Brown intentionally swerving into Plaintiff at a high rate of speed, immediately ejecting Plaintiff from his motorcycle.

23. Defendant Brown knowingly and intentionally used an unparalleled and illegal amount of force to stop Plaintiff, which was tantamount to deadly force. Defendant Brown knowingly and intentionally attempted to cause death or serious bodily injury to Plaintiff.

24. Deputy David DeHaan admitted in his report that at the time of Defendant Brown ramming Plaintiff, "We again tried to block the path of the fleeing motorcycle."

25. At the time of this incident, the EPSO's policy regarding vehicle pursuits was governed by numerous policies and laws, including but not limited to the following, which are listed as they were stated at the time of this incident:

    a. EPSO Policy 306.1.1 stated, "An individual's unreasonable desire to apprehend a fleeing suspect at all costs has no place in professional law enforcement."

    b. EPSO Policy 306.3 stated, "Deputies shall drive with due regard for the safety of all persons and property."

    c. EPSO Policy 306.4.3(f) stated, "Because roadblocks involve a potential for serious injury or death to occupants of the pursued vehicle if the suspect does not stop, the intentional placement of roadblocks in the direct path of a pursued vehicle is generally discouraged and should not be deployed without prior approval of a supervisor. If roadblocks are deployed, it should only be done under extraordinary conditions when all other reasonable intervention tactics have failed or reasonably

        appear ineffective and the need to immediately stop the pursued vehicle substantially outweighs the risks of injury or death to occupants of the pursued vehicle, deputies or the public."

        d. Colorado Revised Statutes (C.R.S.) 42-4-108 mandates, "The provisions of this section shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of such driver's reckless disregard for the safety of others."

26. Despite knowing that there were numerous governing statutes and policies dictating otherwise, EPSO Deputies, including Defendant Brown, knowingly and intentionally violated numerous policies and laws, continued the pursuit, deployed roadblocks, and willfully rammed into Plaintiff.

27. Defendant Brown knew or should have known that with respect to the foregoing policies and laws, among others, the risk of serious injury or death to Plaintiff was magnified exponentially due to Plaintiff being on a motorcycle.

28. Deputy DeHaan initiated the traffic stop on Plaintiff for disregarding a stop sign, a low-level traffic offense. At that time, there were no other allegations of any other offense. Likewise, Deputy DeHaan indicated that he had only intended on giving Plaintiff a warning and then releasing him without a summons.

29. Defendant Brown knew that this traffic stop was for disregarding a stop sign and he knew that there were no other allegations of any other offense that would justify the pursuit or the level of force that he used.

30. For the pursuit that occurred on or about August 19, 2017, Plaintiff was charged with one felony (vehicular eluding) and other traffic offenses. Vehicular eluding is an F5-level felony. In the 4th Judicial District (El Paso County) in Colorado, wherein Plaintiff was charged, the standard bond for an F5-level felony was $2,000, payable by cash, surety, or property. The standard bond for Plaintiff would have therefore been $2,000. Through a bondsman, Plaintiff would have had to pay approximately $200 to $300 to bond out of jail.

31. Through a series of deceptive practices and misconduct on or about August 20, 2017, Deputies with the EPSO, known and unknown, arranged it so that Plaintiff would be held in jail on a $100,000 cash-only bond. The cash-only stipulation ensured that Plaintiff would be unable to use a bondsman or any other kind of collateral in order to bond out of jail. For example, EPSO Deputies stated that they had found a loaded gun in Plaintiff's home and that Plaintiff was a convicted felon. However, at the time of this incident, Plaintiff was not a convicted felon, nor

in any way prohibited from owning a firearm. The EPSO Deputies lied in order to secure a higher bond for Plaintiff and unconstitutionally punish him and hold him in jail.

32. After approximately 13 days in custody at the El Paso Criminal Justice Center (CJC), a bond hearing was held and the amount of Plaintiff's bond was reduced to $10,000, payable by cash, surety, or property. Through a bondsman, Plaintiff was able to immediately bond out of jail for only $460, a difference of over two hundred times less than the original, unlawful amount.

33. During the entirety of his time in the CJC that began on or about August 20, 2017, Plaintiff was deprived of any meaningful medical care, despite his repeated requests to Deputies and other staff at the CJC. He was, however, held in segregation for a large portion of his time in custody. Although his segregation was intended as punishment, it was purported to be in order to care for Plaintiff's medical needs from the head-on collision. Ironically, Plaintiff's placement in medical segregation was subsequent to the Deputies lying and claiming that Plaintiff had no injuries and that he was faking his injuries. Furthermore, despite being held in medical segregation and Plaintiff making repeated requests for medical care, he was largely ignored by the Deputies and other staff at the CJC.

34. After Plaintiff was bonded out of jail, Plaintiff sought and received competent medical care at St. Francis Medical Center.

35. Defendant Carey knowingly made numerous statements that he knew to be false, while also intentionally concealing other pertinent facts. For example, on or about August 20, 2017, Defendant Carey knowingly lied in an attempt to connect Plaintiff to an unrelated incident that had apparently occurred on the morning of August 19, 2017. Referring to the unrelated incident, Defendant Carey stated in an application for a search warrant for Plaintiff's home, "The operator of the motorcycle was wearing a red and black jacket, and he had on a helmet, which obstructed his face. The helmet had red and black colors, and also had possible white stripes." In the same sworn affidavit, referring to the incident involving Plaintiff, he stated, "The operator was wearing a black, red, and white helmet, which is the same colors as the helmet worn by the operator on 08/19/17." However, in Defendant Carey's radio transmission during the unrelated incident on the morning of August 19, 2017, he stated to dispatch that the motorcyclist was wearing a white helmet, not the black, red, and white helmet that he had written in his affidavit. Likewise, in the affidavit, Defendant Carey intentionally omitted that Plaintiff was actually found wearing a white and black motorcycle jacket, a completely different color than the red and black jacket that the motorcyclist was apparently wearing in the unrelated incident.

36. As Plaintiff was in no way connected to the incident on the morning of August 19, 2017, Plaintiff was not ultimately charged for that incident; he was only charged with the incident that occurred that evening. Despite knowing that Plaintiff did not fit the description of the prior incident, Defendant Carey intentionally lied. By doing so, he violated the law, violated Plaintiff's Constitutional rights, unfairly prejudiced Plaintiff, caused the Defendants' unlawful entry into Plaintiff's home, and caused the excessive pretrial confinement of Plaintiff.

37. Defendant John David responded to the scene of the collision on or about August 20, 2017. He subsequently participated in the extensive cover-up that ensued.

38. On or about August 21, 2017, Defendant Brown sought to unlawfully charge Plaintiff with criminal mischief, despite him knowing that no probable cause existed to charge as such. Under the applicable Colorado Revised Statutes (C.R.S.), the charge of criminal mischief (C.R.S. 18-4-501) is for defendants that knowingly damage property. Defendant Brown knew that there was no probable cause to sustain this charge. In fact, there was never even an allegation that Plaintiff knowingly caused any property damage. To the contrary, Defendant Brown knew that he had intentionally rammed Plaintiff. Subsequently attempting to charge Plaintiff with criminal mischief was tantamount to Defendant Brown attempting to cover up his own criminal conduct. Likewise, Defendant Brown had actually knowingly and intentionally committed the crime of criminal mischief by intentionally ramming Plaintiff, along with numerous other criminal offenses. Nevertheless, the purported damages to Defendant Brown's patrol vehicle were nearly nonexistent and were able to be wiped away with a cloth.

39. Defendant Carey, alongside several other EPSO Deputies, known and unknown, have also engaged in an extensive, relentless campaign of oppression, civil rights violations, and harassment of Plaintiff. For example, on or about May 3, 2018, Defendant Carey went to Plaintiff's house in order to accuse him of a separate incident of vehicular eluding on a motorcycle. Unbeknownst to Defendant Carey, at that time, Plaintiff was on house arrest with an ankle monitor, which showed that Plaintiff was at his house at the time of the incident. Another person was ultimately charged and convicted for that incident. Nevertheless, Defendant Carey stated, "Anytime we get in a bike chase on Powers from now on, your house is likely going to be one we drive by and see if that bike shows up."

40. On or about May 7, 2018 at approximately 12:15 AM, three EPSO Deputies arrived at Plaintiff's house in two marked EPSO patrol vehicles to accuse him of yet another incident of vehicular eluding. They also contacted Plaintiff's probation officer and indicated that they were able to "positively identify" Plaintiff as the one

who was involved in that incident on or about May 7, 2018. As was the case with the accusation on May 3, 2018, prior to making the false accusations, they were unaware that Plaintiff was on house arrest with an ankle monitor at the time. Similarly, the ankle monitor showed that Plaintiff was at his home at the time of the incident on May 7, 2018.

41. On May 7, 2018 at approximately 2:35 AM, which was approximately two hours after the EPSO Deputies departed Plaintiff's home, Plaintiff was in a state of severe emotional distress due to the EPSO Deputies continuing to harass him. At that time, Plaintiff went to the AspenPointe walk-in crisis center for emergency mental health intervention.

42. To the best of the knowledge of Plaintiff, no reports were generated in order to review and evaluate the pursuit, its unlawful tactics, or use of force.

43. To the best of the knowledge of Plaintiff, no disciplinary or corrective action has been taken against Defendant Brown or any of the other Deputies involved in the pursuit or subsequent unlawful activities.

44. Since the time of the Defendants' use of unreasonable and unnecessary force, Plaintiff's ability to perform and enjoy his usual activities, including family and social activities, has been significantly impaired. In addition, Plaintiff has suffered severe emotional distress and mental anguish that has affected his psychological well-being. Plaintiff has also suffered permanent physical injury.

45. As a direct and proximate result of the intentional acts of Defendants, Plaintiff sustained severe mental and physical pain and suffering and injury.

46. Plaintiff's motorcycle, clothing, and other gear also sustained significant damages in the collision on or about August 19, 2017.

47. Plaintiff was deprived of his motorcycle and a significant amount of other property that was unlawfully seized from his home on or about August 20, 2017 until approximately April of 2018.

48. Defendant Brown's misconduct and his own recognition thereof is evidenced by his intentional deception on reports.

49. Lying on police reports is not only unethical, it is illegal and corrupts the criminal justice system. It also denies due process guaranteed to Plaintiff by the Fifth and Fourteenth Amendments to the U.S. Constitution.

50. The Defendants acted maliciously and wantonly in violating Plaintiff's federal rights.

51. The use of deadly force under the circumstances was excessive, unreasonable, and unnecessary.

## CLAIMS FOR RELIEF

52. All Defendants violated Plaintiff's right against excessive force and unreasonable search and seizure, as guaranteed by the Fourth Amendment to the U.S. Constitution.

53. All Defendants violated Plaintiff's right to due process as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution.

54. All Defendants showed deliberate indifference to Plaintiff's health and safety, among other violations, thereby violating Plaintiff's right against cruel and unusual punishment, as guaranteed by the Eighth Amendment to the U.S. Constitution.

55. Defendants Brown, David, Elder, and El Paso County failed to train and supervise its or his employees.

56. All Defendants failed to provide Plaintiff with competent medical care.

57. All Defendants were grossly negligent and demonstrated reckless or callous disregard for Plaintiff's rights, as well as intentional violations of state and federal law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against each of the Defendants, and award him all relief as allowed by law, including, but not limited to, the following:

a) Appropriate relief at law and equity;

b) Declaratory relief, injunctive relief, and other appropriate equitable relief;

c) Compensatory and punitive damages on all claims allowed by law in an amount to be determined at trial;

d) Relief in the nature of mandamus;

e) Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

f) Pre- and post-judgment interest at the appropriate lawful rate;

g) Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: August 16, 2019

_____
Brian Halik, Plaintiff
6050 Stetson Hills Blvd Ste 320
Colorado Springs, CO 80923